Filed 12/23/22  P. v. Lopez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B317628 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA497696 |
| JOSUE BRAYN LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge. Affirmed with directions.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Josue Brayn Lopez (defendant) was convicted of first degree murder as a direct aider and abettor. On appeal, he contends there was insufficient evidence of premeditation and deliberation to support his conviction. He also claims that an error in the abstract of judgment requires correction. We agree that the abstract must be corrected, but we otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Rodriguez and Sanchez are murdered.

Selvin Martute was also known as Mr. Rodriguez and Little Boy; we refer to him as Rodriguez. Danny Sanchez was also known as Kevin Sanchez, Gasparin, and Cornejo; we refer to him as Sanchez. Rodriguez and Sanchez were always together and appeared to be best friends. They were members of Parkview Locos, a clique of the MS-13 gang.

On April 3, 2020, Rodriguez and Sanchez were in an alley behind Wi Spa, located at 2700 Wilshire Boulevard, which is in MS-13 territory. A car drove up and two members of the 18th Street gang pinned Rodriguez against a fence and killed him.

Sometime after Rodriguez was killed, surveillance cameras recorded defendant and three members of Parkview Locos on bicycles arriving at Sanchez's home, which was a tent or shed with a blue tarp near Hoover Street and Carondelet Street. Video footage showed them leaving on their bicycles about eight minutes later.

On April 6, 2021, Sanchez was found dead in his tent; he had a large amount of blood on his lap and pants area. Sanchez had been stabbed 27 times and died from multiple sharp force injuries to his organs, including his lungs and major arteries.

## 2.    Gang Evidence

MS-13 has three main "cliques" that operate in the Rampart area of Los Angeles—Rampart Locos, Parkview Locos, and Coronado Locos. While each clique operates independently, its members are friendly and work with each other as they are all under the umbrella of MS-13. MS-13's main rival is the 18th Street gang.

Gangs have certain codes of conduct, and gang members want to get "respect" from their peers and those in leadership positions. MS-13 members are expected to look out for each other, and running away from a conflict would be a sign of weakness. When members of MS-13 encounter rivals, especially members of 18th Street, they are expected to retaliate. It would be a sign of weakness if an MS-13 member was unwilling to act violently when confronted with a rival gang, and would signal to the rival gang that there is an opportunity to move in and take over MS-13 territory. Such a display of weakness would put the MS-13 member in danger and subject him to discipline within his own gang for failing to abide by MS-13's code of conduct. That discipline might include assaulting the member with fists, bats, or other blunt objects, and, at times, stabbing and murdering the individual.

Each clique has a "shot caller." The shot caller makes sure the clique is maintaining the code of conduct and committing crimes that benefit the gang. An MS-13 gang member with multiple tattoos is "not at the bottom of the totem pole;" the individual has "proven themselves" and "earned that respect to obtain each tattoo." It is sometimes necessary to involve members of one clique in the discipline of another clique member to provide oversight. MS-13 is very strict about its code of conduct and is

3

willing to kill its own members to maintain order within the gang.

### 3.	The Undercover Operation[1]

On April 16, 2021, before he was interviewed by the police, defendant was placed in a cell with an undercover agent who wore a recording device. Police detectives listened to the conversation between defendant and the agent while it took place.

Defendant was a member of the Coronado Locos clique.[2] He knew Rodriguez because Rodriguez sometimes "kicked it" with defendant's clique. After Rodriguez was murdered, some individuals from Parkview Locos told defendant that Sanchez had set Rodriguez up to be killed. In response, defendant asked them, "[W]ell, what are you fools doing about it?" The Parkview Locos individuals were "youngsters" who were "iffy" about what they were doing. Defendant wanted to "go see what's up" and talk to Sanchez. He told the group they "should know what's up" and "do what you got to do." Defendant offered to go with the group to help and provide back up.

Defendant told the undercover agent he knew the group was going to "whack" Sanchez because defendant and the Parkview Locos were "turned up" and "were talking about whacking [Sanchez] back." Defendant knew the Parkview Locos members "were gonna do something" and felt that someone from

---

[1] The type of undercover operation conducted in this case is known as a "Perkins operation." (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

[2] He has several gang tattoos including a tattoo of horns on the top of his head, an "MS" tattoo on his cheek, and a huge tattoo of "MS" on his chest.

4

another clique should be present to say the discipline was justified or "legit."

When they arrived at Sanchez's tent, defendant sat down next to Sanchez while the Parkview Locos group stood in front and around them. Defendant and the others questioned Sanchez about whether he had set Rodriguez up. Someone from Parkview Locos took out a knife, and defendant tried to signal to Sanchez that the individual wanted to stab and kill him. Parkview Locos members looked to defendant for direction and advice, but he felt any issue with Sanchez was a matter within their clique. Defendant was just there to "scope it out to see like if it's legit."

Three individuals from Parkview Locos began stabbing Sanchez, causing him to scream. Defendant covered Sanchez's mouth because he was making too much noise and defendant did not want them to get caught. In response to being asked by the agent if anyone was holding Sanchez down, defendant stated, "Yeah, like it was me. Like I was going like this to him the whole time." At some point, Sanchez got up and ran or moved around. The individuals from Parkview Locos continued "whacking" Sanchez, so Sanchez sat back down. Defendant told them that Sanchez was making too much noise and defendant covered Sanchez's mouth "again." Sanchez bit defendant's hand, causing him to let go. Someone stabbed Sanchez a final time and then they left the tent. Defendant covered Sanchez, who was still moving, with a blanket and left. Defendant had to change his clothes because he "was covered in blood and shit."

### 4.  Defendant's Police Interview

Ten minutes after the undercover operation was completed, two detectives interviewed defendant. He said he was 23 years old and had been in the Coronado Locos clique of MS-13 since he

was 12. Defendant told the detectives he was angry when he heard Rodriguez had been killed.

Defendant agreed to go to a meeting to confront Sanchez if people needed his help. He was there to give his opinion as to who was right and who was wrong, but he denied being a "shot-caller" for this meeting. Defendant sat next to Sanchez at the meeting. The others began stabbing Sanchez and defendant covered Sanchez's mouth but let go when he realized they really were stabbing him, which defendant had not expected them to do. Defendant told them to stop but the last person stabbed Sanchez one more time. He could tell Sanchez was dying, and he felt bad and put a blanket over him. If it had been up to defendant, he would have told the group to stab Sanchez in the legs instead of killing him. Defendant also told the detectives that if he had not participated in Sanchez's murder, he would have been labeled "a snitch, a bitch" and endangered himself and his family. Indeed, he would "probably [be] somewhere buried."

## 5.      Conviction and Sentencing

After a jury trial, defendant was found guilty of first degree murder in violation of Penal Code section 187, subdivision (a) for Sanchez's murder.[3] He was sentenced to a prison term of 25 years to life.

## DISCUSSION

## 1.      Substantial evidence supports the murder conviction.

It is undisputed that defendant was prosecuted under a direct aider and abettor theory. Consistent with that theory, the

---

[3] All undesignated statutory references are to the Penal Code.

jury was instructed on aider and abettor culpability. The jury was also instructed on the definitions of malice, and on first and second degree murder. As noted, the jury returned a verdict of first degree murder. Defendant contends the evidence is insufficient to support his conviction because the only evidence of his specific intent was based on speculation from a gang expert on how gangs operate. We are not persuaded.

When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) Our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might be reasonably reconciled with the defendant's innocence. (*People v. Manibusan* (2013) 58 Cal.4th 40, 92.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Murder is of the first degree when it is willful, deliberate and premeditated. (§ 189, subd. (a).) A killing is premeditated and deliberate if it is considered beforehand and occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*Ibid.*) Premeditation and deliberation do not require any extended

period of time. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.) The issue is not so much the duration of time as it is the extent of reflection, because thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

Three categories of evidence are especially probative to establish premeditation and deliberation: (1) what was the defendant doing before he committed the crime (planning activity), (2) facts about the relationship between the victim and the defendant (motive), and (3) the manner of killing. (*People v. Potts, supra*, 6 Cal.5th at pp. 1027–1028; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.) The so-called *Anderson* factors are not all required and are not exclusive; instead, they are a framework to guide appellate review. (*People v. Morales* (2020) 10 Cal.5th 76, 89.)

"Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. ([*People v.*] *McCoy* [(2001)] 25 Cal.4th 1111, 1117–1118.) Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. (*Id.* at p. 1118.) Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder. … An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own

culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167.)

There is sufficient evidence in the record of planning, motive, and manner of killing from which the jury could find that defendant aided and abetted the Parkview Locos members in murdering Sanchez, and that defendant knew they intended to kill and he shared that intent.

First, defendant and the Parkview Locos members had a motive for killing Sanchez. MS-13 had a code of conduct mandating that its members retaliate against rival gangs and especially against 18th Street gang members. Discipline for failing to uphold this code included assault, stabbing, and murder. MS-13 was willing to kill its own members to maintain order within the gang. Sanchez was murdered by members of his own gang as discipline for setting Rodriguez up to be killed by 18th Street gang members, or for not retaliating when 18th Street gang members murdered Rodriguez in MS-13 territory. Defendant also admitted he got "mad" when he found out that Rodriguez had been killed "by the enemies and shit." And defendant "was mad about how these fools were kind of iffy about what they were doing. …"

Second, there was planning evidence. Defendant and individuals from Parkview Locos met and discussed disciplining Sanchez for Rodriguez's murder. During their meeting before Sanchez was killed, defendant asked them, "[W]ell, what are you fools doing about it?" Defendant then offered to go with the group to help and provide back up when Sanchez was confronted. Defendant also told the undercover agent he knew the group was going to "whack" Sanchez because defendant and the Parkview

Locos were "turned up" and "were talking about whacking [Sanchez] back." Defendant felt that someone from another clique should be present when they confronted Sanchez to say the discipline was justified or "legit."

Third, the manner of killing supported an inference of premeditation and deliberation. Sanchez was cornered in his tent by four people from his own gang. And with defendant's help, the Parkview Locos members stabbed Sanchez 27 times. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 425 [jury could reasonably infer premeditation and deliberation when a weapon was fired 28 times over two minutes].)

There was also strong evidence that defendant aided or encouraged the commission of the murder and shared the murderous intent of the actual perpetrators. (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1118.) As we discussed before, defendant told the undercover agent he knew the Parkview Locos members were going to "whack" Sanchez because defendant and the Parkview Locos were "turned up" and "were talking about whacking [Sanchez] back." And after they got to Sanchez's tent, defendant covered Sanchez's mouth because Sanchez was making too much noise while he was being stabbed. In fact, defendant said he held Sanchez down "the whole time." Defendant also said he brought a blindfold with him to Sanchez's tent because he was mad. And defendant acknowledged that a Parkview Locos member kept looking at defendant for direction when they were in Sanchez's tent.

Defendant relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644, for his assertion that expert testimony about the general practices of gangs cannot be used to establish a defendant's mens rea. Defendant's interpretation of its holding is

overbroad. *Killebrew* does not generally prohibit such testimony; rather, the reviewing court concluded that in view of the facts and circumstances of that case, the expert's opinion about the defendant's subjective knowledge and intent was inadmissible. Notably, the expert's testimony in *Killebrew* was the only evidence offered by the prosecution to establish the elements of the crime. "As such, it [was] the type of opinion that did nothing more than inform the jury how [the expert] believed the case should be decided. It was an improper opinion on the ultimate issue and should have been excluded." (*Id.* at p. 658.)

Here, in contrast to *Killebrew*, the evidence of defendant's intent to help kill Sanchez was not based solely on the gang expert's testimony. As explained by the Attorney General, defendant's mental state was established through his "own admissions and the circumstances of Sanchez's death, *in addition* to the gang expert testimony that gave context to the gang undertones."[4] We also observe that defendant has not pointed us to the specific expert testimony that was objectionable, or shown that he preserved the issue by objecting to the testimony at trial. This argument is, therefore, deemed forfeited. (See *People v. Perez* (2020) 9 Cal.5th 1, 7 [ordinarily, the failure to object to the admission of expert testimony at trial forfeits an appellate claim that such evidence was improperly admitted].)

In sum, substantial evidence supports defendant's first degree murder conviction as a direct aider and abettor.

---

[4] By way of example, the gang expert testified that he believed the attack on Sanchez was planned based on defendant's statements during the undercover operation.

## 2. The abstract of judgment should be corrected.

Defendant also argues, and the Attorney General concedes, that the abstract of judgment must be corrected to remove a checkmark in the box indicating that sentencing occurred pursuant to "PC 667(b)-(i) or PC 1170.12," that is, under the Three Strikes law. As defendant points out, no prior conviction for a serious or violent felony was pled or proven, and he was not sentenced under the Three Strikes law. We therefore agree that the abstract must be corrected to remove the checkmark in box No. 8.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment by removing the checkmark in box No. 8 indicating that defendant was sentenced under the Three Strikes law and to ensure that a certified copy of the corrected abstract is sent to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.

13